IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Edward W. Nottingham**

Civil Action No. 05–cv–00026–EWN–PAC


ALPINE BANK, a Colorado banking corporation,

      Plaintiff,

v.

PLATT T. HUBBELL,
KELLEY S. HUBBELL, and
GEORGIA CHAMBERLAIN,
as Public Trustee of Garfield County, Colorado,

      Defendants.

---

## ORDER AND MEMORANDUM OF DECISION
---

      This is a deed foreclosure and breach of contract case.  Plaintiff Alpine Bank (hereinafter "Plaintiff" or the "Bank") alleges that Defendants and Third-Party Plaintiffs Platt T. Hubbell and Kelley S. Hubbell defaulted on a promissory note to Plaintiff without justification, entitling the Bank to recovery.  Defendants, in turn, allege: (1) their default is excused because Plaintiff breached the contract between them; (2) Plaintiff committed the torts of negligent misrepresentation and non-disclosure; and (3) Plaintiff violated the Colorado Consumer Protection Act (hereinafter "CCPA"), Colo. Rev. Stat. section 6–1–101, *et seq.*  This matter is before the court on "Alpine Bank's Motion for Summary Judgment and Memorandum Brief in

Support Thereof," filed April 5, 2006.  Jurisdiction is premised upon diversity, 28 U.S.C. § 1332

(2006).

## FACTUAL BACKGROUND

*1.   Facts*

The following facts are taken from various submissions to the court and are the result of

this court's painstaking endeavor to cull the undisputed from disputed facts despite both parties'

flagrant disregard for my procedural rules.[1]  Plaintiff is a banking corporation with its principal

place of business in Colorado.  (Compl. for Foreclosure Pursuant to Rule 105 [Colorado Rules of

Civil Procedure] ¶ 1 [filed Nov. 10, 2004] [hereinafter "Compl."]; *admitted at* Hubbells' Answer

and Counterclaim ¶ 1 [filed Jan. 21, 2005] [hereinafter "Answer"].)  At some point prior to

January 22, 2003, Defendants, who were not full-time residents of Colorado, purchased land in

---

[1]Pursuant to my practice standards:

> Any party opposing the motion for summary judgment shall, in a section of the brief required by rule 56.1A of the United States District Court for the District of Colorado Local Rules of Practice (Civil) styled "Response to Statement of Undisputed Material Facts," admit or deny the asserted material facts set forth by the movant.  The admission or denial shall be made in separate paragraphs numbered to correspond to movant's paragraph numbering.

(*See* Practice Standards—Civil, Special Instructions Concerning Motion for Summary Judgment ¶ 4.)  Wholly ignoring these standards, Defendants have submitted a section styled "Fact Issues Precluding Summary Judgment," in which they altogether fail to respond to Plaintiff's factual assertions and, instead, proffer eighty-five new paragraphs of "fact issues."  Furthering the confusion, Plaintiff's reply fails to respond directly to the vast majority of Defendants' "Fact Issues."  I admonish both parties, but particularly Defendants, for their flagrant failure to comport with my requirements and warn that such transgressions will not be tolerated in future submissions.

the state with the intent to construct a new home on the property (hereinafter the "Project").  (*Id.* ¶¶ 2, 4; *admitted at* Answer ¶¶ 2, 4.)  At that time, Plaintiff marketed its construction lending services by publicly advertising with the slogan: "So . . . you're about to buy a new home, or build one.  You concentrate on your dream.  We'll take care of everything else" (hereinafter the "Advertisement").  (Hubbells' Resp. in Opp'n to Alpine Bank's Mot. for Summ. J., Ex. C [Bank Marketing Materials] [hereinafter "Defs.' Resp."].)  Also prior to January 22, 2003, Defendants met on more than one occasion with Elizabeth Cox, an assistant vice president in Plaintiff's Carbondale, Colorado branch to inquire about a home construction loan.  (*Id.*, Ex. B, Part 1 at 3–4 [Cox Dep.])[2]  During one such meeting, Defendants expressed their concern about building a home while living out-of-state and their resulting desire for regular communication with their lender regarding the progress of their home construction.  (*Id.*, Ex. B, Part 1 at 10, Part 2 at 1 [Cox Dep.].)  Ms. Cox, in response to these concerns, informed Defendants that if they chose the Bank as their lender, it "would hire a professional inspection service to inspect the property's completeness once a month and that [Ms. Cox] as a loan officer would also inspect the property once a month [in order to] make sure that the monies that had been drawn were coincided with the project being at [that stage of] completion."  (*Id.*, Ex. B, Part 2 at 3 [Cox Dep.].)  Ms. Cox did not make any disclaimer regarding the inspections and did not tell Defendants that the

---

[2]A significant portion of Defendants' "Fact Issues Precluding Summary Judgment" focus on their interactions with Ms. Cox and are supported by citation to her deposition.  (*See* Defs.' Resp., Fact Issues Precluding Summ. J. *passim*.)  Plaintiff does not directly respond to most of Defendants' "fact issues" and nowhere contests the authenticity or accuracy of Ms. Cox's deposition statements.  (*See* Pl.'s Reply.)  Therefore, for the purposes of this motion, I deem Ms. Cox's deposition statements regarding her interactions with Defendants undisputed.

inspections would only be performed for the Bank's benefit; on the contrary, Ms. Cox understood

that the inspections were for the customer's benefit as much as for the Bank's.  (*Id.*, Ex. B, Part 2

at 4 [Cox Dep.].)

>    ### a.    *Construction Loan Agreement*

On January 22, 2003, Defendants executed a promissory note (hereinafter the "Note"),

Construction Loan Agreement (hereinafter "CLA"), and a Construction Dead of Trust with the

Bank for the purpose of building a home on their Colorado property (hereinafter the "Project").

(Alpine Bank's Mot. for Summ. J and Mem. Br. in Supp. Thereof, Statement of Undisputed

Material Facts ¶¶ 1, 3, 4 [filed Apr. 5, 2006] [hereinafter "Pl.'s Br."]; *admitted at* Defs.' Resp.,

Fact Issues Precluding Summ. J. ¶ 3.)  On July 25, 2004, the Note became due and payable in full.

(*Id.*, Ex. 2 [Note].)

>    The CLA provided in relevant part:

> CONDITIONS PRECEDENT TO EACH ADVANCE.  Lender's obligation to
> make initial Advance and each subsequent Advance under this Agreement shall be
> subject to the fulfillment to Lender's satisfaction of all the conditions set forth in
> this Agreement and in Related Documents.

>> Approval of Contractors, Subcontractors, and Materialmen.  Lender shall
>> have approved a list of all contractors employed in connection with the
>> construction of the improvements . . . .  Lender shall have the right to
>> communicate with any person to verify the facts disclosed by the list or by
>> any application for any Advance, or for any other purpose.

>> Plans, Specifications, Permits.  Lender shall have received and accepted a
>> complete set of written Plans and Specifications setting forth all
>> improvements for the Project, and Borrower shall have furnished to Lender
>> copies of all permits and requisite approvals of any governmental body
>> necessary for the construction and uses of the Project.

Architect's and Construction Contracts.  Borrower shall have furnished in form and substance satisfactory to Lender an executed copy of the Architect's Contract and an executed copy of the Construction Contract.

Budget and Schedule of Estimated Advances.  Lender shall have approved a budget for the Project and a schedule of the estimated amount and time disbursements of each Advance.

. . . .

Satisfactory Construction.  All work usually done at the stage of construction for which disbursement is required shall have been done in a good and workmanlike manner . . . in compliance with the Plans and Specifications.  Borrower shall also have furnished to Lender such proofs as Lender may require to establish the progress of the work, compliance with applicable laws, freedom of the Property from liens, and the basis for the requested disbursement.

Certification.  Borrower shall have furnished to Lender a certification by an engineer, architect, or other qualified Inspector acceptable to Lender that the construction of the improvements has complied and will continue to comply with all applicable statutes, ordinances, codes, regulations and similar requirements.

DISBURSEMENT OF LOAN FUNDS. . . .

Application for Advance.  Each application shall be stated on a standard . . . form approved by Lender, executed by Borrower, and supported by such evidence as Lender shall reasonably require. . . .  Each application for an Advance shall be deemed a certification of Borrower that as of the date of such application, all representations and warranties contained in the Agreement are true and correct, and that Borrower is a in compliance with all provisions of this Agreement.

Payments. . . .  At its sole option, Lender may directly pay the General Contractor and any subcontractors or other parties the sums due under the Construction Contract.  Borrower appoints Lender as its attorney-in fact to make such payments.  This power shall be deemed coupled with an interest, shall be irrevocable and shall survive in Event or Default under this Agreement.

. . . .

LIMITATION OF RESPONSIBILITY.  The making of any Advance by Lender shall not constitute or be interpreted as either (A) an approval or acceptance by Lender of the work done through the date of the Advance, or (B) a representation or indemnity by Lender to any party against any deficiency or defect in the work or against any breach of contract.  Inspections and approvals of the Plans and Specifications, the Improvements, the workmanship and materials used in the Improvements, and the exercise of any other right of Inspection, approval, or injury granted to Lender in this Agreement are acknowledged to be solely for the protection of Lender's interests, and under no circumstances shall they be construed to impose any responsibility for liability of any nature whatsoever on Lender to any party.  Neither Borrower nor any contractor, subcontractor, materialman, laborer, or any other person shall rely, or have a right to rely, upon Lender's determination of the appropriateness of any Advance.  No disbursement or approval by Lender shall constitute a representation by Lender as to the nature of the Project, its construction, or its intended use for Borrower or for any other person, nor shall it constitute an Indemnity by Lender to Borrower or to any other person against any deficiency or defects in the Project or against any breach of contract.

(*Id.*, Ex. 3 at 2–4 [CLA].)[3]

### b.     *Construction of the Project*

On January 23, 2003, Defendants signed a residential construction agreement with Third-Party Defendant Carney Brothers Construction (hereinafter "CBC") for construction of the Project.  (Pl.'s Br., Ex. 5 [Residential Construction Agreement].)  Plaintiff was not a party to this

---

[3]During Ms. Cox's tenure, Plaintiff had internal guidelines related to construction lending, which she understood to establish the Bank's "standard of how it wished to conduct its construction lending."  (Defs.' Resp., Ex. B, Part 1 at 2 [Cox Dep.], Ex. D [Guidelines].)  Defendants explore these guidelines in detail in the section of their brief entitled "Fact Issue Precluding Summary Judgment."  (*See id.*, Fact Issues Precluding Summ. J. ¶¶ 30–37.)  Because Defendants do not allege that these guidelines represent an agreement between the parties, and because Defendants do not make any substantive arguments regarding the implication of these guidelines on their claims, I decline to discuss the guidelines at all.  (*See* Defs.' Resp.)

agreement.  (*Id.*, Ex. 6 at No. 1 [Request for Admission].)  According to Defendants,

construction of the Project began in or around May 2003.  (Defs.' Resp., Fact Issues Precluding

Summ. J. ¶ 43.)[4]  Plaintiff controlled the disbursement of funds, but Defendants signed off on each

of CBC's construction draws.  (*Id.*, Fact Issues Precluding Summ. J. ¶ 44.)  Ms. Cox sent

approval forms to Defendants for each disbursement, noting the billing was acceptable to her and

the Bank.  (*Id.*, Ex. B, Part 6 at 8–9 [Cox Dep.].)  In the last quarter of 2003, Defendants became

concerned with the slow progress of the construction, as well as escalating costs.  (*Id.*, Fact Issues

Precluding Summ. J. ¶ 45.)  They had several meetings with CBC and the Bank attempting to

resolve these issues.  (*Id.*)  On December 11, 2003, Defendants orally terminated CBC's contract.

(*Id.*, Fact Issues Precluding Summ. J. ¶ 46.)  On December 12, 2003, Defendants discovered that

CBC had never procured the necessary building permits for the Project.  (*Id.*, Fact Issues

Precluding Summ. J. ¶ 47.)  Subsequently, Defendants hired a licensed architect and professional

engineer to inspect the work.  (*Id.*)  They were informed that: (1) the home was less than a third

complete; (2) much of that work would have to be repaired or replaced due to significant defects

in design and/or construction; and (3) the cost of making repairs would likely equal or even

exceed the cost of tearing the whole house down and starting over.  (*Id.*)

---

[4]Plaintiff does not directly respond to Defendants factual assertions regarding construction of the Project or the Bank's relationship with CBC.  (*See* Pl.'s Reply at 4–5.)  For the purposes of this motion, I, thus, deem them admitted as true.  *See Byers v. City of Albuquerque*, 150 F.3d 1271, 1274 (10th Cir. 1988).

c.      *CBC's Relationship with the Bank*

Prior to hiring CBC, Defendants asked a Bank employee, Joseph Scofield, whether CBC was a reputable builder.  (Defs.' Resp., Fact Issues Precluding Summ. J. ¶ 50.)  According to Defendants, Mr. Scofield recommended the contractor highly, telling Defendants that: (1) they could not do any better in choosing a contractor; (2) he knew Ian Carney personally; and (3) CBC was "second in line" to build Mr. Scofield's personal residence.  (*Id.*)  The Bank did not inform Defendants of CBC's long-standing relationship with the Bank as a customer.   (*Id.*)

In June 2003, after Defendants' construction loan closed, but early in the construction of the Project, Plaintiff and CBC terminated their bank-customer relationship.  (*Id.*, Ex. B, Part 4 at 1 [Cox Dep.]; *see also* Reply to Counterclaim ¶ 15 [filed Feb. 14, 2005] [hereinafter "Pl.'s Reply to Counterclaim"].)  According to Defendants, the Bank did not inform Defendants that there were any issues involving CBC until September 2003.  (Defs.' Br., Fact Issues Precluding Summ. J. ¶ 55.)  At that point Ms. Cox became aware of a CBC overdraft check written to a subcontractor on the Project.  (Pl.'s Br., Ex. B, Part 3 at 8–10 [Cox Dep.].)  She amended the procedure for CBC's draws on the construction loan account in order to protect the Bank and Defendants.  (*Id.*)  Instead of relying on CBC to pay the subcontractors directly, Ms. Cox required CBC to write checks to the Bank, and she then distributed the funds to the subcontractors.  (*Id.*, Ex. B, Part 3 at 10 [Cox Dep.].)  Ms. Cox informed Defendants about this change in the disbursement procedure, explaining that there were other irregularities involving CBC, but that she could not discuss them in detail because they were unrelated to Defendants'

loan.  (*Id.*, Ex. B, Part 4 at 2–3 [Cox Dep.].)  According to Defendants, Ms. Cox did not

recommend that they replace CBC as their general contractor or that they conduct an independent

investigation of CBC.  (*Id.*)

Based on the Bank's partial disclosure of the issue, Defendants sought the Bank's advice

regarding whether they should consider firing CBC and "were assured by Mr. Scofield that they

should continue with [CBC], that Ian Carney would do the right thing and that the Bank would

make CBC do it right."  (*Id.*, Fact Issues Precluding Summ. J. ¶ 56.)  Defendants relied on those

assurances in conjunction with any lack of any additional information from the Bank in their

decision to continue with CBC.  (*Id.*)  According to Defendants, had they known the full extent of

CBC's irregularities with the Bank, they would have terminated their contract with CBC

immediately.  (*Id.*)

Moreover, Defendants claim to have questioned the Bank regarding the appropriateness of

the first few construction draws, particularly regarding the percentage of the draws disbursed to

CBC as profit and overhead.  (*Id.*, Fact Issues Precluding Summ. J. ¶ 51.)  The Bank assured

Defendants that the draws were appropriate, and they relied on such representations to continue

the Project with CBC.  (*Id.*)  Throughout the Project, the Bank recommended that Defendants

approve CBC's construction draws, and in doing so, Defendants relied on the Bank's advice as

well as the prior representations regarding regular Bank inspections of the Project.  (*Id.*)  Finally,

Defendants allege that during the December 11, 2004 meeting with CBC and the Bank, in which

Defendants orally terminated CBC's contract, Mr. Scofield advocated for CBC rather than for Defendants.  (*Id.*, Fact Issues Precluding Summ. J. ¶ 58.)

## 2.    *Procedural History*

On November 4, 2004, Plaintiff filed a complaint in the District Court of Garfield County, Colorado alleging: (1) entitlement to the entire unpaid principal balance of the Note; (2) interest; (3) late charges; and (4) attorneys' fees.  (Compl. ¶¶ 5–16.)  On January 5, 2005, Defendants filed a notice of removal to this court.  (Defs.' Notice of Removal [filed Jan. 6, 2005].)  On January 21, 2005, Defendants filed an Answer and Counterclaim alleging: (1) negligent misrepresentation; (2) breach of contract; (3) fraudulent nondisclosure; and (4) violation of the CCPA.  (Answer.)  On February 14, 2005, Plaintiff filed a reply to Defendants' counterclaims.  (Pl.'s Reply to Counterclaim.)  On April 5, 2006, Plaintiff filed a motion for summary judgment, arguing it was entitled to summary judgment on its claim for enforcement of the Note, as well as on all of Plaintiffs' counterclaims.  (Pl.'s Br.)  On May 1, 2006, Defendants responded to the motion.  (Defs.' Resp.)  On May 16, 2006, Plaintiff replied in support of its motion.  (Pl.'s Reply.)  This matter is fully briefed and ripe for review.

## ANALYSIS

## 1.    *Standard of Review*

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, the court may grant summary judgment where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material

fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)

(2006); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986); *Concrete Works, Inc.

v. City & County of Denver*, 36 F.3d 1513, 1517 (10th Cir. 1994). The moving party bears the

initial burden of showing an absence of evidence to support the nonmoving party's case. *Celotex

Corp. v. Catrett*, 477 U.S. 317, 325 (1986). "Once the moving party meets this burden, the

burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material

matter." *Concrete Works*, 36 F.3d at 1518 (citing *Celotex*, 477 U.S. at 325). The nonmoving

party may not rest solely on the allegations in the pleadings, but must instead designate "specific

facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324; *see* Fed. R. Civ. P.

56(e) (2006). A fact in dispute is "material" if it might affect the outcome of the suit under the

governing law; the dispute is "genuine" if the evidence is such that it might lead a reasonable jury

to return a verdict for the nonmoving party. *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir.

1997) (citing *Anderson*, 477 U.S. at 248). The court may consider only admissible evidence when

ruling on a summary judgment motion. *See World of Sleep, Inc. v. La-Z-Boy Chair Co.*, 756 F.2d

1467, 1474 (10th Cir. 1985). The factual record and reasonable inferences therefrom are viewed

in the light most favorable to the party opposing summary judgment. *Byers*, 150 F.3d at 1274

(citing *Concrete Works*, 36 F.3d at 1517).

**2.      *Evaluation of Claims***

　　　　Plaintiff argues it is entitled to summary judgment on the Note because: (1) Defendants

have admitted to signing the Note; (2) Plaintiff is the holder of the Note; and (3) a promissory

note is self-standing and establishes the right of payment to the holder of the note.  (Pl.'s Br. at

4–5.)  Further, Plaintiff alleges it is entitled to summary judgment on Defendants' tort-based

counterclaims because: (1) the counterclaims are barred by the economic loss rule; and (2)

Plaintiff does not have an independent duty of care to Defendants.  (*Id.* at 5–10.)  Finally, Plaintiff

urges that Defendants': (1) breach of contract counterclaims are barred by the "Limitation of

Responsibility" contained in the CLA; and (2) CCPA counterclaim fails because Defendants

cannot establish that Plaintiff's alleged deceptive trade practice has a significant public impact.

(*Id.* at 10–14.)  Defendants counter that: (1) the economic loss doctrine does not apply because

Defendants' tort-based claims are not grounded in the CLA and involve a residential construction

project; (2) Plaintiff owed a duty of care to Defendants as their fiduciary and/or agent; and (3)

their breach of contract claim is actionable as a result of Plaintiff's oral promises and inherent

obligation to perform the contract in good faith; and (4) based on the foregoing, they have a valid

defense to the foreclosure action.  (Defs.' Resp. at 26–39.)

> ### *a.      Defendants' Counterclaims[5]*
>
> ### *i.      Breach of Contract*

Plaintiff seeks summary judgment on Defendant's breach of contract counterclaim,

arguing that the unambiguous terms of the CLA do not place any of the obligations on the Bank

that Defendants claim to have been breached.  (Pl.'s Br. at 10–11.)  Defendants counter that

Plaintiff's oral promises, as well as the terms of the CLA, obligated Plaintiff, at minimum, to

---

[5]I begin with Plaintiff's request for summary judgment on Defendants' counterclaims because my findings have the potential to establish a valid defense to payment of the Note.

conduct inspections and ensure that loan disbursements matched the percentage of work completed.  (Def.'s Br. at 34–35.)

I begin with the purported oral promises by Plaintiff to oversee the Project.  (*See id.* at 34, Fact Issues Precluding Summ. J. ¶¶ 2–8.)  As a general rule, "[p]arol evidence is inadmissible to vary or contradict the terms of an unambiguous agreement, but where uncertainty exists such evidence may be received to explain the contract."  *Montoya v. Cherry Creek Dodge, Inc.*, 708 P.2d 491, 492 (Colo. Ct. App. 1985).  Whether there is an ambiguity is a question of law to be determined by the court.  *Id.*  Curiously, Defendants do not directly argue that there is any ambiguity in the terms of the CLA.[6]  Instead, Defendants seek to incorporate the alleged "oral promises [because they] were entirely consistent with the degree of control given the Bank under the terms of the [CLA]."  (Defs.' Resp. at 34.)  Defendants cite no rule of law supporting such incorporation and this court finds it to be in contradiction to the parol evidence rule.  *See Montoya*, 708 P.2d at 492.  Moreover, this court has taken the liberty of reviewing the CLA and, with only minimal assistance from Defendants, can find no evidence of ambiguity in the contract. I remind Defendants that "[j]udges are not like pigs, hunting for truffles buried in [contracts]." *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991).  Accordingly, I find the parol

---

[6]Defendants do, however, cite to a case from Oregon finding oral representations enforceable when not inconsistent with an *incomplete* written agreement.  (Defs.' Resp. at 34–35 [citing *Siegner v. Interstate Prod. Credit Ass'n of Spokane*, 820 P.2d 20, 26–27 (Or. App. 1991)].)  Yet, Defendants fail to argue, or give this court any reason to conclude, that the CLA is an incomplete agreement.

evidence rule bars Defendants' reliance on any oral promises made prior to execution of the CLA.

Next, I turn to the terms of the CLA.  "In construing the terms of a contract, courts must give full effect to the intent of the parties as expressed by the language of the agreement." *Cooley v. Big Horn Harvestore Sys., Inc.*, 813 P.2d 736, 748 (Colo. 1991).  Plaintiff concedes that the CLA provides that certain conditions should be met prior to disbursement, but contends that the Bank was not obligated to ensure that any or all of these conditions were met.  (Pl.'s Br. at 10–11.)  Defendants counter that Plaintiff was obligated to conduct inspections and ensure that loan disbursements matched the percentage of work completed.  (Defs.' Resp. at 34.)  Defendants generally aver that the long list of conditions precedent to the disbursement of loan funds were obligatory for Plaintiff.  (*Id.*)  I disagree.

The CLA frames the "conditions precedent" to each advance as obligations of the *borrower* in order to be entitled to disbursement, not obligations of the lender in order to be permitted to disburse funds, as the following makes plain:

> CONDITIONS PRECEDENT TO EACH ADVANCE.  Lender's obligation to make the Initial Advance and each subsequent Advance under this Agreement shall be subject to the fulfillment to Lender's satisfaction of all the conditions set forth in this Agreement and in the Related Documents.
>
> . . . .
>
> Borrower shall have furnished to Lender copies of all permits and requisite approvals of any governmental body necessary for the construction and uses of the Project.

-14-

> . . . .  Borrower shall have furnished to Lender a certification by an engineer, architect, or other qualified Inspector acceptable to Lender tha the construction of the improvements has complied and will continue to comply with all applicable statutes, ordinances, codes, regulations and similar requirements.

> . . . .

> Borrower shall have furnished in form and substance satisfactory to Lender an executed copy of the Architect's Contract and an executed copy of the Construction Contract.

(Pl.'s Br., Ex. 3 at 3 [CLA].)  If there was any doubt as to which party these conditions were intended to protect versus impose obligations upon, the "LIMITATION OF RESPONSIBILITY" explains that:

> [t]he making of any Advance by Lender shall not constitute or be interpreted as either (A) an approval or acceptance by Lender of the work done through the date of the Advance, or (B) a representation of indemnity by Lender to any party against any deficiency or defect in the work or against any breach of contract.

(*Id.*, Ex. 3 at 4 [CLA].)

Courts that have considered analogous contractual conditions have concluded that "these provisions grant [the lender] the authority to withhold funds until it is satisfied that the work has been completed to an adequate extent under the terms of the [CLA], but they do not require [the lender] to do so before disbursement can be proper."  *Pimental v. Wachovia Mort. Corp.*, 411 F. Supp. 2d 32, 36–37 (D. Mass. 2006); *see also*, *Parker v. Columbia Bank*, 604 A.2d 521, 531 (Md. Ct. Spec. App. 1992) (finding a term in a CLA providing the bank was not obligated to disburse draws when the loan was out of balance did not mean that the bank was *prohibited* from disbursing draws if the loan was out of balance); *Laight v. Idaho First Nat'l Bank*, 697 P.2d

-15-

1225, 1227 (Idaho Ct. App. 1985) (finding no implied duty of a bank to obtain lien waivers under a CLA requiring the waivers, given its explicit disclaimer of responsibility regarding such waivers). That the conditions precedent intended to protect Plaintiff also had the potential "collateral consequence" of protecting Defendants "does not mean that a duty necessarily existed between" the parties. *Vercon Constr., Inc. v. Highland Mort. Co.*, No. 3:03–1370–JFA, 2005 U.S. Dist LEXIS 42585, at *17 (D.S.C. July 21, 2005); *see Pimental*, 411 F. Supp. 2d at 37. Based on the foregoing, I find the plain language of the CLA imposes no obligations upon Plaintiff regarding disbursements or inspections. Thus, Plaintiff is entitled to summary judgment on Defendants' breach of contract claim.

### ii.    *Breach of Implied Covenant of Good Faith*

For the reasons stated above, Defendants' claim that Plaintiff breached the covenant of good faith and fair dealing implied in the CLA also must fail. Defendants assert that even if the CLA's conditions precedent were subject to the Bank's discretion, the Bank was obligated to act in good faith in exercising that discretion. (Defs.' Resp. at 35–37.) Colorado recognizes that every contract contains an implied duty of good faith and fair dealing. *Amoco Oil Co. v. Ervin*, 908 P.2d 493, 498 (Colo. 1995). This doctrine seeks to effectuate the intent of the parties and to honor their reasonable expectations. *Id.* It applies when the manner of performance under a specific contract term allows for discretion on the part of one party. *Id.* "When one party uses discretion conferred by the contract to act dishonestly or act outside of accepted commercial practices to deprive the other party of the benefit of the contract, the contract is breached." *Wells*

*Fargo Realty Advisors Funding v. Uioli, Inc.*, 872 P.2d 1359, 1363 (Colo. Ct. App. 1994).

Importantly, an implied covenant of good faith "will not contradict the terms or conditions for which a party has bargained," *Amoco*, 908 P.2d at 498, nor will it "obligate a party to accept a material change in the terms of the contract or to assume obligations that vary or contradict the contract's express provisions," *Wells Fargo*, 872 P.2d at 1363.

In the instant case, it is true that Plaintiff had the discretion to withhold disbursements if certain conditions precedent, including inspections, proof of building permits, and plan specification approvals, were not met. (*See* Pls.' Br., Ex. 3 at 3–4 [CLA].) The CLA also makes clear that these conditions precedent "are acknowledged to be *solely* for the protection of Lender's interests, and under no circumstances shall they be construed to impose any responsibility or liability of any nature whatsoever on Lender to any party." (*Id.*, Ex. 3 at 4 [CLA] [emphasis added].) Under these circumstances, to impose an obligation on the Bank to, for instance, perform inspections in order to protect Defendants' interests would force Plaintiff "to assume obligations that vary or contradict the contract's express provision[]" that such inspections were solely for Plaintiff's benefit. *Wells Fargo*, 872 P.2d at 1363; *see also Parker*, 604 A.2d at 531 (finding "the duty of good faith merely obligates a lender to exercise good faith in performing contractual obligations; it does not obligate a lender to take affirmative actions that the lender is clearly not required to take under its loan documents"). Here, Defendants freely entered into a CLA that included a term unambiguously stating that the Bank's involvement in overseeing the Project was solely for the Bank's benefit. Thus, "this is essentially a complaint

-17-

that, in retrospect, [Defendants do] not like certain terms of the contract to which [they] agreed."

*Pimental*, 411 F. Supp. 2d at 39 (finding no bad faith breach of contract for allegedly reckless

disbursement of funds, because the construction loan contract "permits [the lender] to conduct

inspections and withhold funds on the basis of such inspections, but does not require [the lender]

to account for [the borrower's] interest in so doing").[7]  Based on the foregoing, I find Plaintiff is

entitled to summary judgment on Defendants' implied covenant of good faith claim.

### iii.    Tort Claims

Defendants assert two tort-based counterclaims on which Plaintiff seeks summary

judgment.  (*See* Answer ¶¶ 25–33, 37–40.)  First, Defendants allege Plaintiff committed negligent

misrepresentation by: (1) representing that the Bank would oversee the Project; and (2) making a

series of representations to Defendants concerning the benefits of hiring CBC.  (*Id.* ¶¶ 25–33.)

Second, Defendants allege Plaintiff committed fraudulent non-disclosure by failing to disclose

material information, unknown to Defendants, about CBC's deficiencies.  (*Id.* ¶¶ 37–40.)  Plaintiff

asserts: (1) all of Defendants' tort claims are barred by the economic loss rule; (2) Defendants

---

[7]Additionally, although this circuit has not directly addressed the issue, there is a strong argument that "where a loan contract imposes a condition precedent for the benefit of the lender alone, the lender is at liberty to waive the conditions."  *Pimental*, 411 F. Supp. 2d at 38; *MCC Inv. Co. v. Racom Corp.*, 323 F.3d 620, 626 (8th Cir. 2003) (noting a party may waive a condition precedent to his own performance of a contractual duty when the condition exists solely for its own benefit); *accord Ins. Co. v. Norton*, 96 U.S. 234, 240 (1878); *Reliance Life Ins. Co. v. Wolverton*, 269 P. 793, 795 (Colo. 1931); *MXL Indus. v. Mulder*, 623 N.E.2d 369, 374 (Ill. App. Ct. 1993); *see also Lehman v. Williamson*, 544 P.2d 63, 65 (Colo. Ct. App. 1975) (suggesting a purchaser may unilaterally waive a condition in contract for sale of land where the condition is solely for his benefit).  Here, because the CLA makes explicit that the conditions precedent at issue are solely for the Bank's benefit, I find the Bank is at liberty to waive those conditions.

have failed to establish a genuine issue of material fact as to the factual predicate for their tort claims; and (3) Defendants have failed to establish a duty of care as a basis for their tort claims. (Def.'s Br. at 5–10.)

### (1)    *Economic Loss Rule Primer*

The economic loss rule mandates that in Colorado, "'a party suffering only economic loss from the breach of an express or implied contractual duty may not assert a tort claim for such a breach absent an independent duty of care from tort law.'"  *BRW, Inc., v. Duffy & Sons, Inc.*, 99 P.3d 66, 72 (Colo. 2004) (quoting *Town of Alma v. Azco Construc., Inc.*, 10 P.3d 1256, 1264 [Colo. 2000]).  This rule serves to maintain the distinction between contract and tort law.  *Town of Alma*, 10 P.3d at 1262.  The Colorado Supreme Court has explained:

> Limiting tort liability when a contract exists between parties is appropriate because a product's potential nonperformance can be adequately addressed by rational economic actors bargaining at arms length to shape the terms of the contract. . . . In this way, the law serves to encourage parties to confidently allocate risks and costs during bargaining without fear that unanticipated liability may arise in the future, effectively negating the parties' efforts to build these cost considerations into the contract.

*Id.*

The economic loss rule does not, however, bar claims between existing parties to a contract, if "the claim is based on a recognized independent duty of care."  *Id.* at 1263. Moreover, "some special relationships," such as that of a fiduciary, "by their nature automatically trigger an independent duty of care that supports a tort action even when the parties have entered into a contractual relationship."  *Id.*

Plaintiff contends that Defendants' tort claims are barred by the economic loss rule because these claims are grounded in the CLA.  (Pl.'s Br. at 5–7.)  Defendants counter that the economic loss rule does not bar their tort claims because these claims are based on the Bank's independent duty of care to Defendants as a fiduciary, a duty not subsumed by the parties' contract.  (Defs.' Resp. at 26–33.)  I address the economic loss rule's implications for Defendants' tort claims only to the extent necessary below.

### (2)    *Negligent Misrepresentation*

Plaintiff seeks summary judgment on Defendants' claim that the Bank negligently misrepresented: (1) that it would oversee the Project; and (2) the qualifications of CBC as a contractor.  (*Id.* at 7–9.)  "Negligent misrepresentation may occur if a person, in the course of his or her business, profession, or employment, supplies false information to another for guidance in his or her business transactions, and the other suffers a pecuniary loss caused by justifiable reliance upon the false information."  *Branscum v. Am. Cmty. Mut. Ins. Co.*, 984 P.2d 675, 679 (Colo. Ct. App. 1999).  A claim for negligent misrepresentation lies only if there has been a misrepresentation as to an existing fact.  *Id.*

First, Plaintiff seeks summary judgment on Defendants' claim that the Bank negligently misrepresented that it would "take care of everything else," thus inducing Defendants to contract with Plaintiff.  (Defs.' Resp. at 27–28.)  Plaintiff argues this claim is barred by the economic loss rule, but Defendants contend that because this misrepresentation occurred prior to the execution of the CLA contract, it is not barred by the rule.  (*Id.* at 28; Pl.'s Reply at 7.)  I find that

regardless of the economic loss rule, this pithy public Advertisement was clearly not a statement of existing fact, but mere puffery. *Cf. Park Rise Homeowners Ass'n, Inc. v. Resource Const. Co.*, No. 04CA0091, 2006 Colo. App. LEXIS 926, at *20 (Colo. Ct. App. June 15, 2006) (quoting *Elliott v. Parr*, 66 P.2d 819, 821 [Colo. 1937]) (noting that "mere statements of opinion such as puffing or praise of goods by seller is no warranty").  Further, as Plaintiff points out, no person would justifiably rely upon such puffery in their decisionmaking.  (*See* Pl.'s Reply at 9–10.)  I, therefore, find the Advertisement cannot serve as a basis for Defendants' fraudulent misrepresentation claim.

Second, Plaintiff seeks summary judgment on Defendants' claim that Ms. Cox's alleged promise that the Bank would generally oversee the Project constitutes negligent misrepresentation.  (Defs.' Resp. at 27–28.)  Plaintiff argues that its purported promise to do something in the future cannot serve as a basis for Defendants' claims.  Plaintiff is correct that an action for negligent misrepresentation "cannot be based solely on the nonperformance of a promise to do something in the future." *Branscum*, 984 P.2d at 679; *High Country Movin', Inc. v. U.S. W. Direct Co.*, 839 P.2d 469, 471 (Colo. Ct. App. 1992).  One caveat to this rule, however, is that "[a] promise concerning a future act, when coupled with a present intention not to fulfill the promise, can be a misrepresentation which is actionable as fraud." *Kinsey v. Preeson*, 746 P.2d 542, 551 (Colo. 1987) (internal quotations omitted).  Defendants assert that the CLA's limitation of liability, suggesting that any action the Bank took to oversee the Project would be solely to protect its own interest, shows that the Bank's alleged promise to oversee the Project on

Defendants' behalf was false when made.  (Defs.' Resp. at 27.)  Viewing the facts in the light most favorable to Defendants, I find there is a genuine issue of material fact as to whether the Bank intended to fulfill its alleged promise to oversee the construction project for Defendants' benefit.

Plaintiff argues that even if there is a factual predicate for the negligent misrepresentation claim, it should be barred by the economic loss rule.  (Pl.'s Reply at 7.)  Defendants counter that negligent misrepresentations made *prior* to the execution of a contract provide the basis for an independent tort claim, thereby avoiding application of the economic loss doctrine.  (Defs.' Resp. at 28.)  Defendants' argument is clearly supported by Colorado caselaw, which establishes that "a contracting party's negligent misrepresentation of material facts prior to the execution of an agreement may provide the basis for an independent tort claim asserted by a party detrimentally relying on such misrepresentations."  *Keller v. A.O. Smith Harvestore Prods., Inc.*, 819 P.2d 69, 72 (Colo. 1991); *accord BRW*, 99 P.3d at 75.  The economic loss rule seeks to protect against potential economic liability for bargained for risks as represented in a contract.  *Town of Alma*, 10 P.3d at 1262.  With no contract, there is no allocation of risks to protect.  Thus, the economic loss rule does not bar Defendants from pursuing a negligent misrepresentation claim based on the Bank's statements made prior to entering into the CLA, and Plaintiff is not entitled to summary judgment on this issue.

Third, Plaintiff seeks summary judgment on Defendants' claim that the Bank made negligent misrepresentations and fraudulent nondisclosures regarding the desirability of CBC as a

general contractor after the execution of the CLA.  (Pl.'s Br. at 7–10.)  Plaintiff contends that

because the CLA expressly provides that it is Defendants' duty to contract with third parties, the

economic loss rule bars Defendants from maintaining a separate tort claim regarding such

contracts.  (Pl.'s Reply at 7–8.)  Defendants counter that nothing in the CLA relates to an

obligation on the part of the Bank to advise Defendants regarding the selection or continuing use

of a contractor.  (Defs.' Resp. at 29.)  After reviewing the CLA, I find no express provision

regarding the parties' duties to contract with or advise about contracting with third parties.  (*See*

Pl.'s Br., Ex. 3 [CLA].)  Arguably, the CLA impliedly contemplates that Defendants will contract

with third-parties and then seek the Bank's approval.  (*See Id.*, Ex. 3 at 3 [CLA] [noting that (1)

Lender "shall approve a list of all contractors employed in connection with the construction;" and

(2) Borrower "shall furnish in form and substance satisfactory to Lender an executed copy of the

Architect's Contract and executed copy of the Construction Contract"].)  Nothing in the CLA,

however, addresses advice or recommendations provided by the Bank regarding contractors.

(*See id.*)  Accordingly, I find "[Defendants'] negligence claim against [Plaintiff] is based on an

alleged breach of a separate duty of care arising from [Plaintiff's] conduct in providing advice and

recommendations concerning [CBC]."  *Cooley*, 813 P.2d at 749 (finding a separate duty of care

arose from advice and recommendation provided that were outside of the scope of a sales and

installation contract); *see also*, *Grynberg v. Agri Tech, Inc.*, 10 P.3d 1267, 1270 (Colo. 2000)

(reaffirming *Cooley*, 813 P.2d 736).  Based on the foregoing, I find the economic loss rule is no

bar to Defendants' claims of negligent misrepresentation and fraudulent nondisclosure after execution of the CLA.

### (3)        *Fiduciary or Confidential Relationship*

Regardless of the economic loss rule, Plaintiff contends that it owed no duty of care to Defendants outside of that laid out in the CLA, and, thus, both of Defendants' tort claims must fail.  (Pl.'s Br. at 5–7; Pl.'s Reply at 5–9.)  Defendants counter that because the Bank undertook to give advice and make representations to Defendants regarding the Project under circumstances making it likely that Defendants would rely on those representations, a genuine issue of material fact exists as to whether a fiduciary or confidential relationship exists between Plaintiff and Defendants.  (Defs.' Resp. at 30–31.)  "A negligence claim will fail if it is predicated on circumstances for which the law imposes no duty of care upon the [party accused of negligence]."  *Connes v. Molalla Transp. Sys., Inc.*, 831 P.2d 1316, 1320 (Colo. 1992).  Plaintiff recognizes that a fiduciary or confidential relationship could serve to establish the requisite duty of care for Defendants' tort claims.  (*See* Pl.'s Br. at 5–7.)  Accordingly, I proceed to analyze whether such a relationship exists.

### (a)        *Repose of Trust*

Under Colorado law, there is no per se fiduciary duty created by a mere borrower-lender relationship.  *First Nat'l Bank v. Theos*, 784 P.2d 1055, 1060 (Colo. Ct. App.), *cert. denied*, No. 90SC191, 1990 Colo. LEXIS 549 (Colo. July 30, 1990).  Nonetheless, "a confidential relationship," which may give rise to a fiduciary duty, "may arise when one party justifiably

imposes special trust and confidence in another, so that the first party relaxes the care and vigilance that he would normally exercise in entering a transaction." *Nicholson v. Ash*, 800 P.2d 1352, 1355 (Colo. Ct. App. 1990); *First Nat'l*, 784 P.2d at 1060–61.

Here, Defendants contend that they reposed a special trust and confidence in the Bank, rendering its misrepresentation that it would oversee the Project and its advice to utilize CBC breaches of a special duty owed to Defendants. (*See* Defs.' Resp. *passim*.) In essence, Defendants argue that because they made it known that they (1) were not full-time residents of Colorado or construction experts, (2) needed a local bank with construction lending expertise to provide some oversight of the Project, and (3) needed advice regarding the selection of a general contractor, and because the Bank provided the requested assurances and advice under circumstances making it likely Defendants would rely on those representations, there is a genuine issue of material fact as to whether a fiduciary or confidential relationship was established. I disagree.

I note at the outset that under Colorado law, "the confidential relationship giving rise to the [fiduciary] duty must have been established prior to the date of the transaction that gives rise to the claim." *Nicholson*, 800 P.2d at 1355; *Turkey Creek, LLC v. Rosania*, 953 P.2d 1306, 1312 (Colo. Ct. App. 1998). Thus, when, for instance, prior to the events giving rise to the claim occurred, (1) the lender and borrower had a joint business venture, *see Dolton v. Capital Fed. Sav. & Loan Ass'n*, 642 P.2d 21, 23–24 (Colo. Ct. App. 1981), or (2) the borrower was a depositor in the lender's bank, *see Rubenstein v. S. Denver Nat'l Bank*, 762 P.2d 755, 756–57

(Colo. Ct. App. 1988), a fiduciary relationship may be found.  *Nicholson*, 800 P.2d at 1335.  In the instant case, however, there is no evidence that Defendants had a pre-existing relationship with the Bank prior to entering into the CLA; thus, there is no genuine issue of material fact as to whether a fiduciary or confidential relationship exists between the parties with regard to the Project.  *See Nicholson*, 800 P.2d at 1355–56 (finding no confidential relationship when plaintiff failed to allege a pre-existing relationship with defendant).

Second, even if the lack of a pre-existing relationship was not a bar, and viewing Defendants' allegations in their most favorable light, I find there are no special circumstances in this case creating a fiduciary or confidential relationship regarding the disbursement of funds or inspection of property.  At the outset, I address Defendants' contention that a primary facet of Plaintiff's wrongful inducement of their confidence was the Advertisement.  (Defs' Resp. at 27.)  Defendants' argument borders on preposterous.  The law requires that to establish a fiduciary relationship, Defendants must have "*justifiably* reposed a special trust or confidence" in the Bank.  *First Nat'l*, 794 P.2d at 1061 (emphasis added).  As discussed above, the Advertisement was clearly mere puffery on which no reasonable person would rely in reposing a special trust in another.  (*See Analysis* § 2(a)(iii)(2), *supra*; Pl.'s Reply at 9–10.)

Additionally, Defendants rely on Mr. Scofield's alleged repeated recommendations of CBC as a contractor in trying to establish a special relationship with the Bank.  (Defs.' Resp. at 30–31.)  Yet, Mr. Scofield's recommendations had a distinctly personal tone to them.  (*See id.*, Fact Issues Precluding Summ. J. ¶ 50.)  Defendants allege:

> Scofield recommended CBC highly, telling [Defendants] that they could not do any better in choosing a contractor, that he knew Ian Carney personally, and that [CBC] was 'second in line' to build Scofield's personal residence only because of a problem with [CBC's] availability to perform the work when Scofield wanted it done.

(*Id.*)  I find it difficult to conceive of this type of recommendation, which is openly based on a single Bank employee's personal experience with a contractor, as a sufficient basis to establish a confidential relationship with the entire Bank as an entity.  Defendants have cited to no caselaw supporting their view.  (*See* Defs.' Resp.)  Mr. Scofield's alleged statement that, even after some CBC deficiencies were known to the Bank, Defendants should continue to utilize the contractor is a closer call.  (*See Id.*, Fact Issue Precluding Summ. J. ¶ 56.)  Still, I find that, standing alone, Mr. Scofield's statements are insufficient to establish a genuine issue of material fact as to whether the Bank had a confidential or fiduciary duty to Defendants.

Defendants also assert that the Bank's alleged representations that it would oversee the Project by performing inspections and controlling disbursement of funds established a fiduciary relationship between the parties.  (*Id.* at 30–33.)  Again, I disagree.  Plaintiff's alleged statements that it would inspect and monitor the Project's progress and control the disbursements are all activities "within the normal course of business" between a construction loan borrower and a lending institution and, therefore, do not constitute "special circumstances" establishing a fiduciary or confidential relationship.  *Torke v. Fed. Deposit Ins. Corp.*, 761 F. Supp. 754, 754–58 (D. Colo. 1991) (finding the fact that a bank put its borrower "in contact with several people to work with him on the development project," "controlled [the borrower's] loan

disbursements," and "took an active interest in obtaining the required zoning on the property" was "within the normal course of business between a developer-borrower and a lending institution and do not constitute special circumstances to establish . . . a fiduciary relationship"). This court finds that "[t]he law does not require the lender to refrain from such exercise of prudence at the risk of becoming a fiduciary 'big brother.'" *Vercon Constr.*, 2005 U.S. Dist. LEXIS 42585, at *17–18.

Moreover, if, during the period of time that Plaintiff was negotiating with Defendants over the prospective construction loan, Plaintiff did lead Defendants to believe that it would perform inspections and make disbursements all for the benefit and protection of Defendants, this belief should have been quickly undone by simply reading the CLA that Defendants signed. On page three of the CLA, under the title "LIMITATION OF RESPONSIBILITY," the Bank expressly stated that "the exercise of any other right of inspection, approval, or inquiry granted to Lender in this Agreement are acknowledged to be *solely* for the protection of the Lender's interest." (Pl.'s Br., Ex. 3 at 3 [CLA] [emphasis added].) In the instant case, there is no evidence before the court that Defendants did not have the capacity or intelligence to evaluate the CLA and Plaintiff's recommendations and to ultimately exercise their independent judgment. To the contrary, Defendants are both airline pilots, one of whom purportedly acted as a general contractor on a spec home project. (Defs.' Resp., Fact Issues Precluding Summ. J. ¶ 1; *id.*, Ex. B, Part II at 1 [Cox Dep.].) If there were evidence suggesting some deficiency on Defendants' part, my analysis here may have been different. *See Paine, Webber, Jackson & Curtis, Inc. v. Adams*, 718 P.2d 508, 517 (Colo. 1986) (noting that courts consider the sophistication, experience, age, education,

-28-

and intelligence of the customer when determining whether a special relationship existed between the customer and his or her broker).  Considering the foregoing, I find Plaintiff has alleged insufficient facts to establish a genuine issue of material fact as to whether Defendants justifiably reposed a special trust in the Bank.

### (b)   *Funds in Trust*

Defendants also argue a fiduciary relationship arose because the Bank held the construction loan funds in trust for disbursement to third-parties rather than releasing them to Defendants.  (Defs.' Resp. at 31–32.)  Yet, Defendants have failed to point to a single case in which a CLA permitting a lender to disburse funds to third-party contractors established a trust.  (*See id.*)  Moreover, the creation of an express trust requires that the settlor declare an intention to create a trust.  *Connolly v. Baum (In re Baum)*, 22 F.3d 1014, 1017–18 (10th Cir. 1994) (citing *In re Estate of Granberry*, 498 P.2d 960, 963 [Colo. App. Ct. 1972].)  Clearly the loan at issue in this case was not provided for the sole benefit of the borrower, but was also intended to benefit the lender; thus, no trust was intended.

### (c)   *Lender as Agent*

Finally, Defendants contend that the Bank agreed to act as Defendants' agent regarding disbursement of funds because the CLA establishes the Bank as Defendants' "attorney in fact" for purposes of making disbursements to third parties.  (Defs.' Resp. at 32–33 [quoting Pl.'s Br., Ex. 3 at 4 (CLA)].)  Without delving into the details of agency law, I find that to the extent that the terms of CLA establish an agency relationship between the Bank and Defendants, the economic

loss rule clearly bars Defendants from pursuing a tort claim based on a breach of that

relationship.[8]  *BRW*, 99 P.3d at 72; *see also GEM Sav. Ass'n v. Sterling Gold Props., LTD.*, No.

12719, 1992 Ohio App. LEXIS 4965, at *16 (Ohio Ct. App. Oct. 2, 1992) ("The fact that this

contract created an agency relationship between [the parties] did not, without more, impose a

fiduciary duty upon [the agent] which was separate from, and in addition to, that imposed on it by

the contract."); *see also* Restatement (Second) of Agency § 376 (1958) ("The existence and

extent of the duties of the agent to the principal are determined by the terms of the agreement

between the parties . . . .").

Defendants, however, argue that the economic loss rule should not bar their tort claim

because the rule does not apply in the context of residential construction projects.  (Defs.' Resp.

at 33.)  Defendants rely on *A.C. Excavating v. Yacht Club II Homeowners Ass'n, Inc.*, a Colorado

Supreme Court decision holding that because "builders have an independent duty of care to act

without negligence in the construction of homes," the economic loss rule does not bar tort claims

against builders even when a contract is in place.  114 P.3d 862, 867–70 (Colo. 2005).

Defendants recognize that *Yacht Club* does not involve the obligations of construction lenders to

---

[8]Defendants also suggest that the infamous Advertisement serves as a basis for establishing an agency relationship.  (Defs.' Resp. at 32.)  I constrain myself when I say that Defendants clearly lack even the most rudimentary understanding of the prerequisites to establishing agency. *See, e.g.*, *Stortoen v. Beneficial Fin. Co.*, 739 P.2d 391, 395 (Colo. 1987) (quoting Restatement [Second] of Agency § 1[1] [1957]) ("'Agency is the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his [or her] behalf and subject to his [or her] control, and consent by the other so to act.'").

refrain from contributing to negligent construction but, nonetheless, argue that the court should find a similar independent duty of care for lenders. I decline to do so.

*Yacht Club* specifically deals with the independent duty of care in home construction for construction professionals, which lenders are not. *See id.* at 868. The court in *Yacht Club* supports its decision entirely with cases addressing the duties of contractors and subcontractors— those actually building the homes, who are closest to the construction, and who can most reasonably be expected to monitor the quality of that construction. *See id.* at 866–68. Moreover, in concluding that these construction professionals do have an independent duty of care, the Colorado Supreme court relied extensively on the state's Construction Defect Action Reform Act, which was intended to "preserve adequate rights and remedies for property owners who bring and maintain construction defect actions." *Id.* at 868 (internal quotations omitted). This act creates remedies against a finite list of "construction professionals," which includes architects, contractors, subcontractors, developers, builders, builder vendors, engineers and inspectors, but *does not* include construction lenders. *See* Colo. Rev. Stat. § 13–20–802.5(4) (2006). I see no reason to extend *Yacht Club*'s reasoning outside of the construction professional context.[9]

Based on the foregoing, and viewing the facts in the light most favorable to Defendants, I find that Defendants have alleged insufficient facts to support a finding that the Bank owed a

---

[9]Further, it stands to reason that whereas a lender's independent duty of care can be established by showing a fiduciary relationship, a builder's independent duty of care is linked to the construction itself—each entity being held responsible for its own sphere of professional expertise.

fiduciary or confidential duty, beyond any established by the CLA, to Defendants. Thus, Plaintiff

is entitled to summary judgment on Defendants' tort-based claims.

### iv.   CCPA

Plaintiff also seeks summary judgment on Defendants' CCPA claim. To prevail on this

claim, Defendants must show:

> (1) that [Plaintiff] engaged in an unfair or deceptive trade practice; (2) that the
> challenged practice occurred in the course of [Plaintiff's] business, vocation,
> or occupation; (3) that it significantly impacts the public as actual or potential
> consumers of [Plaintiff's] goods, services, or property; (4) that [Defendants]
> suffered injury in fact to a legally protected interest; and (5) that the challenged
> practice caused [Defendants'] injury.

*Hall v. Walter*, 969 P.2d 224, 235 (Colo. 1998). Plaintiff contends that Defendants have alleged

insufficient facts to prove up element three—that Plaintiff's allegedly deceptive trade practice has

a significant public impact. (Pl.'s Br. at 11–14.) Defendants respond that the Bank's

Advertisement as well as its oral representations to potential clients do, indeed, have a significant

public impact. (Defs.' Resp. at 37–38.)

I begin with the Advertisement. To establish a deceptive trade practice, Defendants, at

minimum, must show that the misrepresentation had the "capacity or tendency to deceive." *Rhino

Linings U.S. v. Rocky Mt. Rhino Lining*, 62 P.3d 142, 148 (Colo. 2003); *May Dep't Stores Co. v.

State ex rel. Woodard*, 863 P.2d 967, 973 (Colo. 1993). Here, for the reasons discussed above

(*see Analysis* § 2[a][iii][2], *supra*), I find the Advertisement was mere "puffery," and thus did not

have the capacity or tendency to deceive a reasonable consumer. *Cf. Rhino Listings*, 62 P.3d at

148 n.11 (indicating that CCPA plaintiffs must show that a reasonable person would have relied on the misrepresentation at issue).

Next, I turn to the Bank's alleged oral representations that it would oversee the Project. As I noted above, Defendants claim that the Bank promised to: (1) provide monthly inspection services; (2) "be on top of the project from beginning to end;" and (3) make regular inspections of the Project to ensure that the monies drawn from the construction loan coincided with the Project's actual stage of completion.  (Defs.' Resp., Fact Issues Precluding Summ. J. ¶¶ 6–8.) Additionally, Ms. Cox testified that there was nothing unusual or unique about her initial discussions with Defendants, and that she talked with them the way she talked with other potential clients.  (*Id.*, Ex. B, Part 1 at 5, Part 2 at 2 [Cox Dep.])  Plaintiff argues these alleged misrepresentations, even if they qualified as a deceptive trade practice, do not have a sufficiently significant public impact to constitute a CCPA violation.  (Pl.'s Br. at 11–14.)

The CCPA is not intended to provide additional remedies to claimants whose disputes have no public impact, but are purely private transactions.  *See Rhino Linings*, 62 P.3d at 150. To determine whether a challenge practice significantly impacts the public within the context of a CCPA claim, the court should consider:

> (1) the number of consumers directly affected by the challenged practice, (2) the relative sophistication and bargaining power of the consumers affected by the challenged practice, and (3) evidence that the challenged practice has previously impacted other consumers or has the significant potential to do so in the future.

*Id.* at 149.  Further, "[w]hen a transaction is no more than a private dispute . . . as is the case

here, it may be more difficult to show that the pubic has an interest in the subject matter." *Id.* at

150 (internal quotations omitted).

Taking Defendants' allegations as true, I need only address the first factor.  Defendants

have not alleged that anyone at the Bank besides Ms. Cox engaged in this purportedly deceptive

practice.  Further, Defendants have not estimated the number of consumers to whom Ms. Cox

had the potential to spread the alleged misinformation.  *See, e.g.*, *Rhino Linings*, 62 P.3d at 150

(no significant public impact affecting three out of five hundred world-wide dealers); *Coors v.*

*Sec. Life of Denver Ins. Co.*, 91 P.3d 393, 399 (Colo. Ct. App. 2003), *aff'd in part, rev'd in part*,

112 P.3d 59 (Colo. 2005) (finding an impact on less than one percent of the company's

consuming public was not sufficiently significant to meet CCPA's requirements).  Accordingly, I

find Defendants have alleged insufficient facts to create a genuine issue of material fact as to

whether Ms. Cox's alleged  misrepresentations did or had the potential to reach a sufficient

number of consumers to constitute a significant public impact.  As a result, Plaintiff is entitled to

summary judgment on Defendants' CCPA claim.

### b.      *Promissory Note*

Finally, Plaintiff seeks summary judgment on its claim for enforcement of the Note which

Defendants admit to executing.  (Pl.'s Br. at 4–5.)  When signatures of the makers of a negotiable

instrument, such as the Note at issue in the instant case, are admitted, "production of the

instrument[] (in completed form) entitles a holder to recover (as a holder in due course) unless the

defendants establish a defense." *Brownlow v. Aman*, 740 F.2d 1476, 1489 [10th Cir. 1984]).  The

maker, when sued on a note, has the burden to establish any defense to enforcement of that note.

*See, e.g.*, *id.*  Defendants claim three defenses to enforcement of the Note: (1) failure of

consideration; (2) breach of contract; and (3) fraud.  (Defs.' Resp. at 38–39.)  I address each

defense in turn.

First, Defendants contend that the "failure of the Bank to properly disburse loan funds

naturally and proximately prevented [Defendants] from receiving any benefit from the loan

transaction." (Defs.' Resp. at 38–39.)  Defendants' argument fails for three reasons: (1) their

allegation is conclusory and unsupported by any caselaw; (2) Defendants have failed to establish

that the Bank improperly disbursed funds, (*see Analysis* § 2[a][i]–[ii], *supra*); and (3) Defendants

undoubtedly received a benefit from the note—the Bank promised to and did disburse funds from

the construction loan account to pay for the construction of the Project.  I remind Defendants that

"[c]onsideration is not to be measured in the light of the eventual success or failure under a

contract but rather consideration is measured as of the time of making the contract." *W. Fed.*

*Sav. & Loan Ass'n v. Nat'l Homes Corp.*, 445 P.2d 892, 897–98 (Colo. 1968).  Based on the

foregoing, I find no failure of consideration for the Note.

Second, Defendants' arguments that the Note is unenforceable due to the Bank's breach

of its obligations to act in good faith and as Defendants' fiduciary agent necessarily fail because

Defendants were unable to establish a genuine issue of material fact regarding any such breach.

(*See Analysis* § 2[a][iii][3], *supra*.)

Finally, Defendants argue in a wholly conclusory fashion that Plaintiff fraudulently induced them to sign the Note. (*See* Defs.' Resp. at 39.) Such a conclusory allegation is patently insufficient to create a genuine issue of material fact. *Baker v. Penn Mut. Life Ins. Co.*, 788 F.2d 650, 653 (10th Cir. 1986) (stating "[c]onclusory allegations . . . do not establish an issue of fact" in motions for summary judgment). Accordingly, I find Plaintiff is entitled to summary judgment on its claim for enforcement of the promissory note.

*3.*     *Conclusions*

Based on the foregoing it is therefore ORDERED as follows:

1.     Plaintiff's motion (# 106) for summary judgment is GRANTED.

2.     Plaintiff has failed to assist the court in calculating the interest due under the Note. Thus, within ten days, the parties are to stipulate to the principal and interest to be reflected in the judgment. At that point, the clerk shall forthwith enter judgment in favor of Plaintiff on the Note, including interest. Plaintiff may have its costs by filing a bill of costs within eleven days of the date on which this order is filed.

3.     Plaintiff may have attorneys' fees by a separate proceedings pursuant to Rule 54 and Local Rule 54.1.

4.     The clerk shall forthwith enter judgment DISMISSING Defendants' counterclaims with prejudice.

Dated this 2nd day of March, 2007.

BY THE COURT:


s/ Edward W. Nottingham
EDWARD W. NOTTINGHAM
United States District Judge