**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Christine M. Arguello**

Civil Action No. 05-cv-00026-CMA-KLM

PLATT T. HUBBELL, and
KELLEY S. HUBBELL (n/k/a KELLY S. HOGAN),

    Third-Party Plaintiffs,

v.

CARNEY BROTHERS CONSTRUCTION, a Colorado corporation,
IAN CARNEY,
RICHARD CARNEY,
TEAMCORP, INC. d/b/a DRAFT TEK, a Colorado corporation,
T.J. CONCRETE CONSTRUCTION, INC., a Colorado corporation, and
KERRY M. KARNAN,

    Third-Party Defendants.

---

**ORDER DENYING THIRD-PARTY PALINTIFFS'
TRAVERSE AND DISMISSING THEIR WRIT OF GARNISHMENT**

---

Pursuant to the "Order Granting Stipulated Motion to Vacate the August 16, 2012 and August 17, 2012 Hearing on the Traverse and to Submit the Case on Stipulated Facts and Briefs" (Doc. # 656), this matter is before the Court on: the Writ of Garnishment filed by Third-Party Plaintiffs Platt T. Hubbel and Kelley S. Hogan (hereafter "Plaintiffs") (Doc. # 634); Garnishee Employers Mutual Casualty Company's ("EMC") Answer to the Writ of Garnishment (Doc. # 636); Plaintiffs' Verified Traverse to EMC's Answer in Garnishment (Doc. # 637); Plaintiffs' Brief in Support of Garnishment (Doc. # 659); and EMC's Brief on

Traverse (Doc. # 660). For the reasons discussed below, Plaintiffs' Traverse is denied and their Writ of Garnishment is dismissed.

## I. BACKGROUND[1]

On January 11, 2010, Plaintiffs settled the above-entitled case with Carney Brothers Construction, Inc. ("CBC"), Richard Carney, and Ian Carney (collectively the "Carney Defendants") by stipulated judgment in the amount of $1,952,500. (Doc. # 580.) As judgment creditor, Plaintiffs filed a Writ of Garnishment in an attempt to garnish the proceeds of an insurance policy held by the Carney Defendants. (Doc. # 634.) The insurance company, EMC, denied liability. (*See* Doc. # 636.) Thereafter, Plaintiffs filed a "Verified Traverse to EMC's Answer in Garnishment, With Request to Set Hearing on Traverse." (Doc. # 637.) However, prior to a hearing on the traverse, the parties filed a stipulated motion, which the Court granted, to vacate the hearing and submit the case to the Court on stipulated facts and briefs. (Doc. ## 655; 656.) The parties filed stipulated facts on August 10, 2012 (Doc. # 658), simultaneous briefing on August 16, 2012 (Docs. ## 659; 660), and rebuttal briefing on September 6, 2012 (Doc. ## 662; 663.) The stipulated facts are as follows.

Plaintiffs owned real property at 0073 Cains Lane, Pinyon Peaks Subdivision, Lot 11 in Carbondale, Colorado. (Doc. # 658 at 1.) In 2003, Plaintiffs obtained a

---

[1] The lengthy and litigious history surrounding this construction defect case is set forth in former-Judge Nottingham's orders of August 10, 2006 (Doc. # 227), and March 2, 2007 (Doc. # 292), as well as in *Alpine Bank v. Hubbell*, 555 F.3d 1097 (10th Cir. 2009). Due to the extensive history of this case, the Court will discuss only those facts and parts of the procedural history relevant to the issues currently before the Court.

construction loan in the amount of approximately $1.2 million dollars from Alpine Bank, and entered into a contract with the Carney Defendants to construct a home on the property. (*Id.*) Construction began around May 2003. (*Id.* at 1-2.) The Carney Defendants, acting as general contractor, worked with several subcontractors, including former-Defendant Teamcorp, on the construction. (*Id.* at 2.)

On December 11, 2003, Plaintiffs terminated their contract with the Carney Defendants. (*Id.*) At the time of contract termination, about one-third of the construction had been completed, but about two-thirds of the construction loan had been disbursed. (*Id.* at 2, 4.) The next day, Plaintiffs were informed by the Garfield County Building Department that the Carney Defendants had not obtained necessary building permits and that the partially constructed improvements had been incorrectly located on the property. (*Id.* at 2-4.)

After terminating the contract with the Carney Defendants, Plaintiffs hired experts to determine the condition of the improvements and the cost of completing the project. (*Id.* at 2.) Plaintiffs' experts noted the following errors: (1) failure to properly site the residence, as the home was constructed 48 feet from the intended location; (2) violations of county/subdivision height restrictions – *i.e.*, the home was six feet higher than designed; (3) failure to follow building plans, which were themselves deficient; and (4) an improperly poured foundation. (*Id.* at 2-3.) Plaintiffs' experts opined that the problems were so pervasive that corrective measures would be cost prohibitive and that fixing the faulty construction would require changes in the design, partial demolition, and

3

reconstruction. (*Id.* at 3.) The experts estimated the costs of repairing the property to be between $1,352,520 and $1,555,399, and that the costs of demolishing the partially completed structure and rebuilding it would be between $1,140,837 and $1,346,063. (*Id.* at 4.)

On November 4, 2004, Alpine Bank brought an action against Plaintiffs alleging that they failed to make payments to the bank pursuant to the terms of the construction loan. (*Id.* at 5.) On September 30, 2009, after extensive litigation, the property was sold in foreclosure for $585,000. (*Id.*) Plaintiffs were never able to use the property. (*Id.*)

For the construction of Plaintiffs' residence, EMC issued the following standard-form Commercial General Liability Coverage ("CGL") policies to CBC: (1) Policy # 2D0-37-54-03 for the period 06/01/02–06/01/03; and (2) Policy # 2D0-37-54-04 for the period 06/01/03 until it was canceled on 01/06/04 (the "Policies"). (*Id.* at 8.) The Policies provided a maximum limit of $1,000,000 per occurrence, with a $2,000,000 general aggregate limit. (*Id.* at 8-9.) Ian Carney and Richard Carney were named insureds as defined by the Policies. (*Id.* at 9.)

The Policies provide as follows:

**COMMERCIAL GENERAL LIABILITY COVERAGE FORM**

**Section 1 – Coverage A. Bodily Injury and Property Damage Liability**

1. **Insuring Agreement**

    a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this

> insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply.
>
> No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages A and B.
>
> b. This insurance applies to "bodily injury" or "property damage" only if:
>
> (1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory"; [and]
>
> (2) The "bodily injury" or "property damage" occurs during the policy period; ….

**2. Exclusions**

> This insurance does not apply to: …
>
> **j. Damage To Property**
>
> "Property damage" to:
>
> (5) That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or
>
> (6) That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.
>
> Paragraph (6) of this exclusion does not apply to "property damage" included in the "products-completed operations hazard".
>
> …

**SECTION V – DEFINITIONS**

> …
>
> **13.** "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.
>
> …

**16.** "Products-completed operations hazard":

    **a.** Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except: …

        **(2)** Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:

            **(a)** When all of the work called for in your contract has been completed.

            **(b)** When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.

            **(c)** When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

**17.** "Property damage" means:

    a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that c [*sic*] caused it; or

    b. Loss of use of tangible property that is not physically injured.

All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

…

**21.** "Your work" means:

    a. Work or operations performed by you or on your behalf; and

        b.        Materials, parts or equipment furnished in connection with such work or operations.

"Your work" includes:

        a.        Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work"; and

        b.        The providing of or failure to provide warnings or instructions.

(*Id.* at 9-12.)

## II. DISCUSSION

### A. LAW

An action for garnishment to collect on a money judgment is governed procedurally and substantively by the law of the state in which the district court is located. *See* Fed. R. Civ. P. 69(a); *see also Whitfield v. Municipality of Fajardo*, 564 F.3d 40, 43 (1st Cir. 2009); *Peacock v. Thomas*, 516 U.S. 349, 359 n.7 (1996) (noting that rule 69(a) "permits judgment creditors to use any execution method consistent with the practice and procedure of the State in which the district court sits"). In Colorado garnishment proceedings, the judgment creditor attempting to enforce the debt allegedly owed to the garnishee has the burden of proving the existence and validity of the garnishee's indebtedness. *Connecticut General Life Ins. v. A.A.A. Waterproofing, Inc.*, 911 P.2d 684, 687 (Colo. App. 1995); *aff'd sub nom., Constitution Assoc. v. New Hampshire Ins. Co.*, 930 P.2d 556 (Colo. 1996). A "stipulated judgment may be enforceable against the defendant's liability insurer if the insurer breaches its contractual obligation to defend the insured." *Old Republic Ins. Co. v. Ross*, 180 P.3d 427, 432 (Colo. 2008). The duty to

defend is triggered when the underlying complaint alleges any facts that might fall within the coverage of the policy.[2]  *Hecla Min. Co. v. New Hampshire Ins. Co.*, 811 P.2d 1083, 1089-90 (Colo. 1991).   However, a court will dismiss garnishment proceedings "when there is no coverage under the policy for the incident in question."  *A.A.A. Waterproofing, Inc.*, 911 P.2d at 687 (citing *Kennedy v. Aerr Co.*, 833 P.2d 807 (Colo. App. 1991)).

To determine whether coverage exists, the policies at issue must be interpreted. Interpretation of an insurance policy's language is a question of law.  *See Am. Family Mut. Ins. Co. v. Allen*, 102 P.3d 333, 340 (Colo. 2004).   The Court applies the principles of contract interpretation when interpreting insurance policies and attempts to carry out the parties' intent and reasonable expectations when they drafted the policies.  *See Cotter Corp. v. Am. Empire Surplus Lines Ins. Co.*, 90 P.3d 814, 819 (Colo. 2004) (citing *Thompson v. Md. Cas. Co.*, 84 P.3d 496, 501 (Colo. 2004)).   To effectuate the parties' intent, the Court construes policy provisions as a whole, rather than in isolation, and gives effect to every provision if possible.  *Truck Ins. Exch. v. Eagle River Water & Sanitation Dist.*, 17 P.3d 844, 846 (Colo. App. 2000).   The Court may not modify provisions to extend or limit coverage beyond that for which the parties contracted.  *Cyprus Amax Minerals Co. v. Lexington Ins. Co.*, 74 P.3d 294, 299 (Colo. 2003).

The Court "seeks to give the words in a policy their plain and ordinary meaning, unless the intent of the parties indicates otherwise."  *Cotter Corp*, 90 P.3d at 819; *see*

---

[2] The Court notes that the alleged property damage, as it relates to the Carney Defendants, in Plaintiffs' Amended Third-Party Compliant (Doc. # 103) is fully incorporated in the stipulated facts, and thus the Court generally will refer just to the stipulated facts in this Order.

*also Union Ins. Co. v. Houtz*, 883 P.2d 1057, 1061 (Colo. 1994) (an insurance policy must be "enforced as written, unless there is an ambiguity in the policy language"); *Compass Ins. Co. v. City of Littleton*, 984 P.2d 606, 613 (Colo. 1999) ("Courts should not rewrite insurance policy provisions that are clear and unambiguous.")  Only where a policy provision is reasonably susceptible to more than one meaning when evaluated within the context of the whole policy is the provision deemed ambiguous.  *Carlisle v. Farmers Ins. Exch.*, 946 P.2d 555, 556 (Colo. App. 1997).  "[B]ecause of the unique nature of insurance contracts and the relationship between the insurer and insured," the Court construes "ambiguous provisions against the insurer and in favor of providing coverage to the insured."  *Cyprus Amax Minerals*, 74 P.3d at 299.

Additionally, exclusionary clauses, which exempt the insurer from providing coverage in certain circumstances, must be written in clear and specific language and construed in favor of coverage.  *McGowan v. State Farm Fire & Cas. Co.*, 100 P.3d 521, 523 (Colo. App. 2004) (*citing Bohrer v. Church Mut. Ins. Co.*, 965 P.2d 1258, 1262 (Colo. 1988)).  Therefore, the insurer "has the burden of demonstrating that the policy exclusion applies in the particular circumstance at issue and that it is not susceptible of any other reasonable interpretation."  *Id.*

Further, where, as here, indebtedness is based upon a stipulated judgment, the actual amount of damages, if any, for which the insurer will be liable depends upon whether the stipulated judgment is reasonable.  *Nunn v. Mid-Century Ins. Co.*, 244 P.3d 116, 123 (Colo. 2010).  If the Court finds that the stipulated judgment is unreasonable,

then it may "choose to instead award whatever damages, up to the amount of the stipulation, it does find reasonable." *Id.*

## B. ANALYSIS

Analysis of a CGL policy begins with determining the broad scope of coverage granted by the policy, followed by a determination of whether exclusionary provisions act to limit said coverage. *Greystone Const., Inc. v. Nat'l Fire & Marine Ins. Co.*, 661 F.3d 1272, 1289 (Colo. 2011). Additionally, "[e]xceptions to exclusions narrow the scope of the exclusion and, as a consequence, add back coverage. But it is the initial broad grant of coverage, not the exception to the exclusion, that ultimately creates (or does not create) the coverage sought." *Id.* (quotation marks and citation omitted).

In the instant case, the Policies at issue provide coverage for "property damage" caused by an "occurrence" within the coverage territory during the policy period. The policies define "property damage" as either "physical injury to tangible property, including all resulting loss of use of that property" or "loss of use of tangible property that is not physically injured." An "occurrence" is an "accident, including continuous or repeated exposure to substantially the same general harmful conditions." As a general matter, "[f]aulty workmanship can constitute an occurrence that triggers coverage under a CGL policy if (1) the property damage was not caused by purposeful neglect or knowingly poor workmanship, and (2) the damage was to nondefective[3] portions of the contractor's or

---

[3] Nondefective property is property that would otherwise be functional and in proper condition if not for damage caused as a result of poor workmanship. *See Greystone Const., Inc.*, 661 F.3d at 1284.

subcontractor's work or to third-party property." *Mt. Hawley Ins. Co. v. Creek Side at Parker Homeowners Ass'n, Inc.*, No. 11-CV-2658, 2013 WL 104795 (D. Colo. Jan. 8, 2013) (unpublished) (citing *Greystone Construction, Inc.*, 661 F.3d at 1286-87).[4]

In this case, there are no allegations that the damage which occurred was caused by purposeful neglect or knowingly poor workmanship. Nor, as reflected in the stipulated facts, did the Carney Defendants cause damage to nondefective portions of their work or to a third-party's property. Rather, Plaintiffs have alleged, and EMC has agreed, that the Carney Defendants' poor workmanship damaged the entire partially built structure, which was defective in numerous and significant ways. As mentioned previously, Plaintiffs' architect and professional engineer inspected the property and identified several errors to the house including: deficient and non-compliant plans; construction not in conformity with those plans; incorrect location of the residence on the property; an improperly poured foundation; and, ultimately, a residence that would be structurally unsound and uninhabitable if completed according to the plans. (Doc. # 658 at 2-3.)

---

[4] The issue of whether faulty workmanship can be an "occurrence" under CGL policies has been heavily litigated and, in recent years, the law in this area has evolved. *See Greystone,* 661 F.3d at 1282 ("a strong recent trend in case law interprets the term 'occurrence' to encompass unanticipated damage to nondefective property resulting from poor workmanship . . . so long as it does not fall under a policy exclusion"); *accord Colorado Pool Systems, Inc., v. Scottsdale Ins. Co.*, --- P.3d ----, 2012 WL 5265981, at *6 (Colo. App. 2012); *but see TCD, Inc. v. Am. Family Mut. Ins. Co.*, 296 P.3d 255, 258 (Colo. App. 2012) ("a claim for damages arising from poor workmanship, standing alone, does not allege an accident that constitutes a covered occurrence, regardless of the underlying legal theory pled") (quoting *Gen. Sec. Indem. Co. of Arizona v. Mountain States Mut. Cas. Co.*, 205 P.3d 529, 534 (Colo. App. 2009). As it is bound to do, the Court follows the articulation of the law set forth in *Greystone* and as applied earlier this year in *Mt. Hawley Ins. Co.*

Judge Daniel, in a prior related case, determined that such errors could arguably be read as meeting the definition of "property damage" in the Policies. *Am. Family Mut. Ins. Co. v. Teamcorp., Inc.*, 659 F. Supp. 2d 1115, 1130-31 (D. Colo. 2009). However, as to whether such damage was caused by an "occurrence," Plaintiffs' only allegation of damage to nondefective property is the consequential damage to the land itself, which occurred by having improperly designed and defectively constructed improvements placed upon it. (Doc. ## 658 at 4; 659 at 5.) The Court will assume, without deciding, that this damage to Plaintiffs' land constitutes "property damage" caused by an "occurrence" within the meaning of the Policies because, as discussed below, even if this damage comes within the Policies' broad grant of coverage, the Policies' exclusionary provisions limit such coverage so as to exclude this damage.

Specifically, the Court agrees with EMC's contention that the Policies' exclusions 2.j.(5) and 2.j.(6) apply to the circumstances of this case. Exclusions such as 2.j.(5) and 2.j.(6) have been aptly described as "faulty workmanship" provisions. *McGowan*, 100 P.3d at 525 (quotation marks and citation omitted). Both exclusions operate to limit coverage for faulty workmanship under similar but different circumstances. The distinction between exclusions 2.j.(5) and 2.j.(6) has been explained in the following way:

> When the work is currently being performed by the contractor, it should be readily apparent whether the work is being performed appropriately. If the contractor fails to remedy faulty work, it clearly would comprise a business risk and should be excluded under exclusion 2.j.(5). In contrast, when the work is completed and accepted, but a latent defect later gives rise to a loss, there is clearly an element of fortuity that should be covered by insurance. An example of the latter situation would be a contractor building a house and first erecting the walls and installing the roof. After the roof is installed,

> the contractor begins working on the interior. The roof, however, was defectively installed and later leaks, causing damage to the partially completed floors. Exclusion 2.j.(6) would bar coverage for costs incurred in repairing or replacing the roof, but the cost of repairing the floors would be covered.

*Cont'l W. Ins. Co. v. Shay Const., Inc.*, 805 F. Supp. 2d 1125, 1131-32 (D. Colo. 2011) (citing Robert J. Franco, Insurance Coverage for Faulty Workmanship Claims Under Commercial General Liability Policies, 30 Torts & Ins. L.J. 785, 798 (Spring 1995)) (brackets and internal citations omitted); *accord Advantage Homebuilding, LLC v. Maryland Cas. Co.*, 470 F.3d 1003, 1012 (10th Cir. 2006).

The first exclusion, 2.j.(5), excludes coverage for "[t]hat particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the 'property damage' arises out of those operations." This exclusion "applies to damage to the work being done by the insured during the course of the insured's work, not to damage that occurred after operations have ceased." *Mt. Hawley Ins. Co.*, 2013 WL 104795, at *3 (quoting *Advantage Homebuilding*, 470 F.3d at 1010-11). This language, even when construed narrowly, includes not only work the Carney Defendants and its subcontractors were hired to do, but any area of the real property that they damaged while performing operations including, but not limited to, the land itself. *See Cont'l W. Ins. Co.*, 805 F. Supp. 2d at 1132 (explaining that exclusion j.(5) "applies to the part of real property on which [the defendant] is performing operations if the damage 'arises out of' those operations"). In this case, no doubt exists that the claimed property damage arose out of operations

performed by the Carney Defendants and their subcontractors during the course of their work.   Given the pervasiveness of the damage in this case, which resulted in an estimate indicating that it would be cheaper to demolish the existing structure and start over (Doc. # 658 at 4), "that particular part of real property" for which 2.j.(5) excludes coverage reasonably encompasses the entire structure and the land on which it was situated. Therefore, the damage of which Plaintiffs complain falls within this policy exclusion.

The second exclusion, 2.j.(6), excludes coverage for "[t]hat particular part of any property that must be restored, repaired or replaced because 'your work' was incorrectly performed on it."   This exclusion has been "interpreted to exclude [from coverage] 'property damage' that *directly or consequentially* occurs from the faulty workmanship of the insured and its contractors/subcontractors (*i.e.*, work that 'was incorrectly performed') while the work is ongoing."   *Mt. Hawley Ins. Co.*, 2013 WL 104795, at *3 (quoting *Advantage Homebuilding*, 470 F.3d at 1012) (emphasis in original).   As interpreted, this exclusion "broadly excludes all property damage that occurred while the work was ongoing and was the result of faulty workmanship."   *Id.*   As discussed above, the property damage in the instant case occurred while the work was ongoing and was the result of the Carney Defendants' and their subcontractors' faulty workmanship. Therefore, such damage falls squarely within this policy exclusion.

Plaintiffs, however, seek to have the Court narrow the scope of exclusion 2.j.(6) via the Policies' "products completed operations hazard" ("PCOH") exception, which effectively states that exclusion 2.j.(6) does not apply to work that is completed and put

14

to its intended use or abandoned. (Doc. # 658 at 10-11.) In this case, however, there is no dispute that when Plaintiffs terminated their contract with the Carney Defendants in 2003, the work on the property was only about one-third complete and that the property was never put to its intended use. (*Id.* at 2.) Further, the Court rejects Plaintiffs' assertion that the PCOH exception applies because the Carney Defendants "abandoned" their work (Doc. # 663 at 10), as the stipulated facts only support a finding that the Carney Defendants stopped working once Plaintiffs terminated their contract. (Doc. # 658 at 2.) Accordingly, the PCOH exception to exclusion 2.j.(6) does not apply.

For the reasons discussed above, while the Carney Defendants' faulty workmanship that damaged Plaintiffs' land might meet the Policies' definition of "property damage" caused by an "occurrence," such damage is excluded from coverage by the express terms of the Policies' 2.j.(5) and 2.j.(6) exclusions.

### III. CONCLUSION

An insurer's duty to defend is broader than its duty to indemnify and only arises when the underlying complaint "alleges any facts that might fall within the coverage of the policy." *Hecla Min. Co.*, 811 P.2d at 1089. Where claims asserted are determined to be "entirely outside the coverage, or if they are excluded by the terms of the insurance policy, then there is no duty to defend." *Lextron, Inc., v. Travelers Cas. and Sur. Co. of Am.*, 267 F.Supp.2d 1041, 1045 (D. Colo. 2003) (citing *Hecla Min. Co.*, 811 P.2d at 1090). As discussed above, the property damage claims asserted by Plaintiffs against the Carney Defendants were excluded by the terms of the EMC Policies, and therefore

no duty to defend existed. Because EMC had no duty to defend the Carney Defendants, it necessarily could not have violated the narrower duty to indemnify. Finally, when there is no coverage under a policy, there is no property subject to garnishment, and the garnishment proceedings must be dismissed. *A.A.A. Waterproofing Inc.*, 911 P.2d at 687. Therefore, Plaintiffs' Traverse must be denied and their Writ of Garnishment dismissed.[5]

Accordingly, and for the foregoing reasons, it is hereby ORDERED that Plaintiffs' Verified Traverse to EMC's Answer in Garnishment (Doc. # 637) is DENIED and their Writ of Garnishment against EMC (Doc. # 634) is DISMISSED, each party to pay its own costs and attorney fees.

DATED:  May   14  , 2013

BY THE COURT:

*[signature: Christine M. Arguello]*

_____
CHRISTINE M. ARGUELLO
United States District Judge

---

[5] Having found no property subject to garnishment, the Court need not determine the reasonableness of the stipulated judgment entered into between Plaintiffs and the Carney Defendants.